IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL FARAH, | ) | CASE NO. 4:06 CV 1481 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RANDALL A. WELLINGTON, *et al.* | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| | ) | |
| DEFENDANT. | ) | |

This matter is before the Court upon the Defendants' Randall A. Wellington, Michael
Budd, Frederick White, and Mahoning County, c/o the Mahoning County Board of
Commissioners ("Defendants")[1] Motion for Summary Judgment.  (Dkt. # 4).

I.    FACTUAL BACKGROUND

The following version of the facts are taken from Plaintiffs' Complaint (Dkt. # 1)
unless otherwise noted.

On November 8, 2002, Plaintiff, Daniel Farah, ("Farah"), was being transported from
the Lorain Correctional Institute in Grafton, Ohio, to the Mahoning County Court House in

---

[1]    The Court notes that Defendant, Jacob DiCarlo, has not yet entered an appearance in this
matter.

order to testify against Defendant, Jacob DiCarlo ("DiCarlo"). (Dkt. 1, Compl. ¶ 10). Prior to his transport to the court house, Farah was housed in the Mahoning County Justice Center ("Justice Center"). (Dkt. # 1, Compl. ¶ 10). On that same date, DiCarlo was also being transferred to the Mahoning County Court House for judicial proceedings. (Dkt. # 1, Compl. ¶ 11). In order to ensure Farah's safety, Judge Robert G. Lisotto, Mahoning County Court of Common Pleas issued an order requiring that Farah and DiCarlo be transported and housed separately. (Dkt. # 1, Compl. ¶ 9). Judge Lisotto's order instructed the following:

> We command you to take Daniel Farah, A434722, now confined in Lorain Correctional Institute, Grafton, Ohio and safely keep in the Mahoning County Justice Center so that you have him before our Common Pleas Courtroom #2 at the Courthouse in said County, Friday, November 8, 2002 at 1:30 p.m. for further court proceedings in the within case.

(Dkt. # 11, Exhibit 2). Upon arrival to the Mahoning County Justice Center, Farah was housed in a section separate from DiCarlo. (Dkt. # 1, Compl. ¶ 9).

Pursuant to Defendants, Randall A. Wellington's ("Wellington"), Michael Budd ("Budd") directions, Defendant, Frederick White ("White") was the deputy sheriff in charge of transferring prisoners from the Mahoning County Justice Center to the Mahoning County Court House on November 8, 2002. (Dkt. # 1, Compl. ¶ 12). On that date, White gathered twelve prisoners, including Farah and DiCarlo, from various pods in the Justice Center and placed them on an elevator. (Dkt. # 1, Compl. ¶ 12). White was the only deputy on the elevator. (Dkt. # 1, Compl. ¶ 12). Farah expressed to White his concern with being in the same confined area as DiCarlo. (Dkt. # 1, Compl. ¶ 12). As a result of White's failure to address Farah's concerns, Farah was "severely assaulted and wantonly and maliciously

2

beaten" by DiCarlo.  (Dkt. # 1, Compl. ¶ 13).

*Defendants' Version*

The Defendants present a slightly different account of the facts surrounding the events of November 8, 2002.  In November of 2002, DiCarlo was being held in the Justice Center, along with a co-defendant, Michael Kapsouris, ("Kapsouris"), awaiting trial on charges of robbery and felonious assault arising out of the stabbing of a woman outside of a bank in Austintown, Ohio.  (Dkt. # 4).  Farah had been held at the Justice Center during the summer months of 2002 and had heard DiCarlo and Kapsouris talk about their part in the Austintown bank robbery and stabbing.  (Dkt. # 4).  Farah, along with another inmate, David McKee, ("McKee") agreed to testify during Kapsouris' and DiCarlo's trial as to the admissions made by the two with regard to their involvement in the bank robbery.  (Dkt. # 4).

At the time of DiCarlo's trial, both Farah and McKee had been transferred from the Justice Center to Lorain Correctional Institute.  (Dkt. # 4, Andrews Aff. ¶ 6).  Judge Robert Lisotto issued judgment entries and warrants instructing that Farah and McKee be brought from the Lorain Correctional Institution ("Lorain") to the Justice Center in order to testify at DiCarlo's trial.  (Dkt. # 4, Exhibits 2 and 3).  On November 5, 2002, Judge Lisotto's bailiff, Patricia Watt, sent a memo to Sergeant Montero regarding the transport of Farah and McKee.  (Dkt. # 4).  Specifically, the memo instructs:

> Daniel Farah & David McKee are both incarcerated in Lorain Correctional. They are <u>both</u> <u>state</u> <u>witnesses</u> in "State of Ohio -vs- Kapsouris & DiCarlo". [sic] Prosecutor needs to talk to witnesses on Monday, Nov. 11, 2002. <u>If</u> <u>possible</u>, do not

3

keep inmates together when transporting or when held in jail.
Any questions, please call.

(Dkt. #4, Exhibit 4)(emphasis in original).  On November 7, 2002, in accordance with this instruction, Farah and McKee were transported from Lorain to the Justice Center in separate vehicles.  (Dkt. # 4, Santamas Aff. ¶ 6).  Both inmates were booked according to procedure upon arrival at the Justice Center.  (Dkt. # 4, Santamas Aff. ¶ 7).  Farah was assigned to T-pod and McKee to F-pod.  (Dkt. # 4, Santamas Aff. ¶ 7).

On November 8, 2002, White was working the 6:00 A.M. to 2:00 P.M. shift at the Justice Center.  (Dkt. # 4, White Aff. ¶ 3).  White began picking up inmates on the sixth floor, where T-pod was located.  (Dkt. # 4, White Aff. ¶¶ 5-6).  He first picked up Farah in T-pod, placed him on the elevator, then continued to the fifth and fourth floors.  (Dkt. # 4, White Aff. ¶ 8).  White picked up DiCarlo in P-pod, on the fourth floor, and then proceeded to the other floors to gather other inmates.  (Dkt. # 4, White Aff. ¶ 9).

White avers that while he was transporting the inmates from the pods to the booking area on November 8, 2002, he "had no knowledge as to why any of the inmates were being transported to court" and "[m]ore specifically, [he] had no knowledge that Daniel Farah or David McKee were to testify as witnesses in Jacob DiCarlo's and Michael Kapsouris' criminal case."  (Dkt. # 4, White Aff. ¶¶ 14-15).  He further states that the only information he had available to him that day was contained in the court movement sheet, which did not indicated that Farah was a state witness or that he was to be kept separate from DiCarlo or Kapsouris.  (Dkt. # 4, White Aff.  ¶¶ 16-17).  In his affidavit, White states that "when the

4

court enters a separation order for inmates because of the risk of violence, the separation order will be noted on the court movement sheet." (Dkt. # 4, White Aff. ¶ 27). By the time White gathered all of the inmates listed on the court movement sheet, around ten to twelve inmates were on the elevator. (Dkt. # 4, White Aff. ¶ 18).

White and the inmates proceeded to the ground floor, where the booking area is located, without incident. (Dkt. # 4, White Aff. ¶ 19). Once the elevator doors opened, the prisoners began to exit from the doors opposite the control panel, where White was standing. (Dkt. # 4, White Aff. ¶ 20). As the prisoners exited the elevator, White indicates that "DiCarlo moved up quickly toward Farah and hit him once in the face." (Dkt. # 4, White Aff. ¶ 22). He further states that he "immediately subdued DiCarlo" and that "medical attention was then given to Daniel Farah." (Dkt. # 4, White Aff. ¶¶ 23-24).

On June 16, 2006, Farah filed a Complaint pursuant to Title 42 U.S.C. §§ 1983 and 1998, alleging defendants violated his Eighth Amendment rights. In his First Cause of Action, Farah alleges that "[a]s a result of the above Defendants' negligence and in violation of Plaintiff's civil rights pursuant to 42 U.S.C. § 1983, the Plaintiff suffered and incurred malicious, intentional, and wanton assault and beating from Defendant DiCarlo and sustained severe facial injuries." (Dkt. # 1, Compl. ¶ 16). Farah alleges, in his Second Cause of Action, that defendants violated his Eight Amendment right to be free from cruel and unusual punishment in failing to "provide a safe and secure place of confinement" for him while he was in their care. (Dkt. # 1, Compl. ¶ 21). Farah's Third Cause of Action is against DiCarlo for personal injuries arising from the incident. (Dkt. # 1, Compl. ¶ 23).

Defendants filed their Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure on July 6, 2006.  (Dkt. # 4).  On September 4, 2006, Farah filed his Memorandum in Opposition to Defendants' motion.  (Dkt. # 11).  Defendants filed their reply to Farah's Memorandum in Opposition on September 25, 2006.  (Dkt. # 15).

Defendants have also moved to strike Farah's attached Exhibit 5, titled "Mahoning County Sheriff's Department Adverse Behavior Report;" and Exhibit 6, a letter authored by Assistant Mahoning County Prosecutor Robert J. Andrews to Judge Wyatt McKay of the Trumbull County Court of Common Pleas.  (Dkt. # 14).  Farah filed a Memorandum in Opposition to Defendants' Motion to Strike, (Dkt. # 16), and Defendants filed a reply (Dkt. # 17).

## II.    STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56 (c).  "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering such a motion, the court must review all of the evidence in the record. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

6

the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56 (c)).  The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25).  The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250).  "A mere scintilla of

7

evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Anderson, 477 U.S. at 250.

## III.   LAW

### Qualified Immunity

Section 1983 provides a cause of action against any person, who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law.[2]  When officials are sued in their individual capacities pursuant to section 1983, they may be protected from liability for damages if their alleged wrongful conduct was committed while they performed a function protected by qualified immunity.  See Cagle v. Gilley, 957 F.2d 1347, 1348 (6th Cir.1992).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The privilege is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Id. Qualified immunity questions must be resolved at the earliest possible stage in litigation.  See Saucier v. Katz, 533 U.S. 194 (2001).

Government officials are generally entitled to qualified immunity when performing

---

[2]     42 U.S.C. § 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

discretionary functions as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1981).  In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  In other words, "in the light of pre-existing law the unlawfulness must be apparent."  Id.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

Consequently, the Court typically utilizes a two-step test in determining whether qualified immunity applies: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."  Estate of Carter v. City of Detroit, 408 F.3d 305, 310-11 (6th Cir. 2005)(citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  On occasion, the United States Court of Appeals for the Sixth Circuit has employed a third step in its qualified immunity analysis.  This step requires the Court to ask "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."  Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003); see also Barnes v. Wright, 449 F.3d 709, 715(6th Cir. 2006); Sample v. Bailey, 409 F.3d 689, 695 (6th Cir. 2005); Champion v. Outlook Nashville, Inc.,

9

380 F.3d 893, 901 (6th Cir. 2004).[3]

Individual claims of immunity must be analyzed on a fact-specific, case-by-case basis to determine whether the constitutional rights were so clearly established when the alleged misconduct was committed that any official in the defendant's position would understand that what they were doing violates those rights.  See Anderson, 483 U.S. 635, 640 (1987).

It is the province of the jury, not the court, to decide any factual disputes.  However, the court ultimately decides the question of whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct."  Adams v. Metiva, 31 F.3d 375, 387 (1994).  While the defendant bears the burden of pleading the defense of qualified immunity, the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.  Miller v. Administrative Office of Courts, 448 F.3d 887, 894 (6th Cir. 2006) (citing Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006)).

## IV.    ANALYSIS

### A.    Section 1983 Claims

The section 1983 claims in the case *sub judice* arise from the Defendants' alleged failure to protect Farah from DiCarlo in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  In their motion for summary judgment,  Defendants

---

[3]      However, "if the case at issue 'is one of the many cases where, if the right is clearly established, the conduct at issue would also be objectively unreasonable,' then this court has 'collapse[d] the second and third prongs' in an effort to 'avoid duplicative analysis.'" Swiecicki v. Delgado, 463 F.3d 489, 498 (6th Cir.2006)(quoting Caudill v. Hollan, 431 F.3d 900, 911 n.10 (6th Cir.2005)).

contend that White, Wellington, Budd, and Mahoning County are entitled to qualified immunity because Farah has not demonstrated that a constitutional violation occurred.

### 1.  Eighth Amendment Violation

The first step in any qualified immunity analysis is to determine whether the facts, viewed in the light most favorable to the plaintiff, show that a constitutional violation could be found.  See Feathers, 319 F.3d at 848 (6th Cir. 2003). Farah contends that White violated his duty to discern and prevent the assault from DiCarlo.  He further asserts that White, Wellington, Budd, and the Mahoning County, "in failing to abide by the Orders of Judge Lisotto, and further, in refusing and neglecting to recognize the danger and peril that they provided to [Farah]" violated Farah's rights under the Eighth Amendment.

It is well established that "the Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."[4] Wilson v. Seiter, 501 U.S. 294, 296 (1991); see also Furman v. Georgia, 408 U.S. 238, 241 (1972) ("That the requirements of due process ban cruel and unusual punishment is now settled.").  In conditions of confinement litigation, the Eight Amendment is triggered by the "unnecessary and wanton infliction of pain." Farmer, 511 U.S. at 834 (citations omitted).  Where, as here, the harm is committed by another prisoner, the claim is characterized as one of "conditions of confinement."  Flint ex rel. Flint v. Kentucky Dept. of Corrections, 270 F.3d 340, 352

---

[4]     The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S.CONST. amend. VIII.

(6th Cir.2001) (quoting <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 400-01 (6th Cir.1999).

In addition, the Eighth Amendment places restraints on prison officials, directing that they must "take reasonable measures to guarantee the safety of the inmates." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984)).  However, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." <u>Farmer</u>, 511 U.S. at 838.

Accordingly, in order to hold a prison official liable for an Eighth Amendment violation, the plaintiff must demonstrate that the defendant acted with "deliberate indifference" to the inmate's safety.  <u>Watkins</u>, 273 F.3d at 686 (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).  More than mere negligence, "[d]eliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety." <u>Watkins</u>, 273 F.3d at 686 (6th Cir. 2001).

Deliberate indifference encompasses both an objective and a subjective component. The objective component requires that the deprivation alleged be "sufficiently serious." <u>Farmer</u>, 511 U.S. at 834.  In other words, the "prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" <u>Farmer</u>, 511 U.S. at 833 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)).

To satisfy the subjective component, however, the plaintiff must show that the governmental officials had "a sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834 (citation omitted).   A "sufficiently culpable state of mind" is one in which "the official

knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

As to the first prong in proving deliberate indifference, the Defendants do not dispute that DiCarlo assaulted Farah; nor do Defendants argue that the objective standard has not been met.

Turning to the second prong, the question presented to the Court is whether the prison official had actual knowledge of a substantial risk to the inmate's safety. A plaintiff may prove this subjective component through circumstantial evidence, or by the fact that the risk was obvious. See Hope v. Pelzer, 536 U.S. 730, 738 (2002) (citing Farmer, 511 U.S. at 842). It is not enough that a reasonable person in the defendant's position reasonably should have known facts from which he reasonably should have drawn the inference that a substantial risk of serious harm exists. See Farmer, 511 U.S. 837-38. Instead, the Supreme Court in adopting a subjective standard for deliberate indifference, requires a showing that the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Id. at 837.

The threshold issue before the Court, therefore, pertains to whether Wellington, Budd, and/or White possessed the requisite subjective knowledge that Farah confronted a substantial risk of serious harm. As the facts differ as to each defendant, the Court shall address each of defendant's subjective awareness in turn.

13

*White's Deliberate Indifference*

Farah asserts his claim of deliberate indifference against White in the following manner:

> In the case at bar, the action and inaction of Defendant White clearly demonstrates the reckless standard as defined and required under <u>Farmer v. Brennan</u>.  According to Farah's affidavit, he told White at least four times he was not supposed to be around DiCarlo.  And not only did Farah tell Deputy White that he was not supposed to be around him, he explained to White that he was testifying against him.

(Dkt. # 11)(internal citations omitted).

However, White's affidavit indicates that on November 8, 2002, he had no knowledge as to why any of the inmates were being transported to the Mahoning County Court.  (Dkt. # 4, White Aff. ¶ 14).  Specifically, he states that he "had no knowledge that Daniel Farah  or David McKee were to testify as witnesses in Jacob DiCarlo's and Michael Kapsouris' criminal case" and that the only information available to White on that date was the court movement sheet, which did not indicate that the two inmates should be separated. (Dkt. # 4, White Aff. ¶¶ 15-17).

Farah's description of the incident on November 8, 2002 has not been challenged. In his affidavit, he avers that when the elevator stopped on P-pod to pick up DiCarlo, he informed White that he was testifying against DiCarlo that morning and that the two inmates were to be kept separate.  (Dkt. # 11, Farah Aff. ¶¶ 12-13).  Farah further contends that he "reminded [White] multiple times about the separation order" and that White "laughed and said, 'Fuck you, Farah!  I told you I have nothing on [the court movement sheet].'" (Dkt. # 11, Farah Aff. ¶ 14).  Finally, Farah testifies, in his affidavit, that "Deputy White did

14

nothing to keep DiCarlo from assaulting me."  (Dkt. # 11, Farah Aff. ¶ 17).

On fact is certain.  The only written information available to White concerning his duties in transporting the inmates from the pods to the booking area were the instructions contained on the court movement sheet.  (Dkt. # 4, White Aff. ¶ 16).  The court movement sheet did not indicate that Farah was to testify in DiCarlo's and Kapsouris' criminal case or that Farah was to be transported separately from DiCarlo.  (Dkt. # 4, White Aff. ¶ 17).  Furthermore, a court mandated separation order was not attached or noted on the court movement sheet for November 8, 2002.  (Dkt. # 4, White Aff. ¶ 27).  To the contrary, the only piece of information indicating that Farah and DiCarlo were to be housed and transported separately is a handwritten memo sent by Judge Lisotto's bailiff, merely requesting that the two inmates be kept apart, "[i]f possible."  (Dkt. # 4, Exhibit 4).  Thus, only in hindsight could one predict that White would have been required to take extra precautions.  Even in that event, his failure to do so would only be tantamount to negligence, which would fall short of an Eighth Amendment claim for deliberate indifference.  See Hadix v. Johnson, 367 F.3d 513 (6th Cir.2004) (Negligent exposure to risk is not sufficient to create Eighth Amendment violation in context of prison conditions.").

Farah asserts that "he told White at least four times he was not supposed to be around DiCarlo."  (Dkt. # 11, Farah Aff. ¶¶ 12-14).  In his affidavit, Farah urges that he even went so far as to tell White that not only was he supposed to be separated from DiCarlo, but that the reason for the separation was because he was going to testify against DiCarlo that morning.  (Dkt. # 11, Farah Aff. ¶ 12).  He also describes "a very hostile and intimidating

15

setting" on the elevator, averring that "other inmates were making comments under their breath encouraging DiCarlo to fight me."  (Dkt. # 11, Farah Aff. ¶ 15).  Nonetheless, the court movement sheet possessed by White did not contain orders to separate Farah from DiCarlo.  A failure to separate the two inmates under such circumstances does not amount to deliberate indifference.  See Davidson  v. Cannon, 474 U.S. 344, 347-48 (1986).

Furthermore, it is worthy of restatement "[t]hat a trier of fact may infer knowledge from the obvious . . . does not mean that it must do so.  Prison officials charged with deliberate indifference might show, for example . . . that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  Farmer, 511 U.S. at 844.  White, in his affidavit, states that "nothing occurred to alert me to the fact that a confrontation might occur between DiCarlo and Farah" and that "[d]uring that time, I heard no threats by any party and there was no physical aggression whatsoever exhibited by DiCarlo from which I could infer that a confrontation was about to ensue."  (Dkt. # 4, White Aff. ¶¶ 25-26).  As there were no written specific instructions to separate the two inmates, there was no reason for White to take reasonable measures to protect Farah.  See Farmer, 511 U.S. at 842-43.

Thus, no constitutional violation occurred.  As such, Defendant White is entitled to qualified immunity with regard to Farah's Eighth Amendment claim.  Having found no constitutional violation, the Court need not inquire into the second and third steps of the qualified immunity analysis.

### 2.    Defendants Wellington and Budd

Turning now to Wellington and Budd, Defendants assert that "[t]here is no evidence in the record that either Sheriff Wellington or Major Budd took any action whatsoever with regard to [Farah]."  (Dkt. # 4).  In order to hold Wellington and Budd responsible under section 1983 for failure to supervise, Farah must demonstrate the existence of more than just *respondeat superior* liability.  Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  He must present sufficient evidence in order to establish that a genuine issue of material fact exists that Wellington and/or Budd either participated in or encouraged the unconstitutional conduct, or at a minimum, show that Wellington and/or Budd "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct." Bellamy, v. Bradley, 729 F.2d 416, 421 (6th Cir.1984); see also Taylor v. Michigan Dep't of Corrs., 69 F.3d 76, 81 (6th Cir.1995).

Farah provides no support connecting White's actions with any liability of Defendants Wellington or Budd beyond mere *respondeat superior* liability.  Indeed, Farah does not even address the liability of these two defendants in his memorandum in opposition.  (Dkt. # 11).  "The individual liability of officials under Section 1983 must be based on their own unconstitutional behavior–not merely the right to control the actions of employees or the failure to act."  Davis v. Fentress County Tennessee, 6 Fed.Appx. 243, 250-51 (6th Cir.2001)(citing Leach v. Shelby County Sheriff, 891 F.2d 1241, 1246 (6th Cir.1990).

Farah has failed to show that either defendant Wellington or Budd specifically

17

encouraged, implicitly approved, or knowingly acquiesced to a constitutional violation known to them that either defendant had the means to prevent.  Consequently, Defendants Wellington and Budd are not liable under Section 1983, and are awarded summary judgment on this issue.

### 3.    Defendant Mahoning County

In his Complaint, Farah assert a claim against Mahoning County for promulgating unconstitutional policies.  See (Compl. ¶¶ 17-18, 110-118).  Initially, the Court notes that, absent a constitutional violation, there can be no municipal liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)(for municipal liability to exist, a constitutional violation must take place); Ewolski v. City of Brunswick, 287 F.3d 492, 516 (6th Cir.2002); Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir.2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.").  Farah has failed to establish a constitutional violation on the part of individual defendants White, Wellington, and/or Budd.  Therefore, Defendants are entitled to summary judgment with respect to Farah's municipal liability claim.

Even if Farah had established a constitutional violation on behalf of White, Wellington, or Budd, the Court concludes that Defendants would still be entitled to summary judgment.  County liability attaches only when a county policy or custom caused the injury or was the moving force behind the constitutional violation.  See Monell, 436 U.S. at 694; Gregory, 220 F.3d at 441; City of Canton v. Harris, 489 U.S. 378, 385 (1989).  To establish a basis for municipal liability, a plaintiff must demonstrate

18

> (1) that the City pursued an official custom or policy of failing to adequately train, supervise, or discipline its officers in particular matter, and (2) that such official policy or custom was adopted by the official makers of policy with "deliberate indifference" towards the constitutional rights of persons affected by the policy or custom.

Haverstick v. Financial Fed. Credit, Inc., 32 F.3d 989, 996 n. 8 (6th Cir.1994) (citing City of Canton, 489 U.S. at 387-88).

Farah argues that "the action or inaction of Deputy White was clearly reckless" and that "[s]uch deliberate indifference demonstrates or is indicative of an accepted practice on the part of deputies working in the Mahoning County Jail." (Dkt. # 11). Pointing to the letter from Mahoning County Assistant Prosecutor Robert Andrews, Farah further argues that the letter acts as "a clear admission of liability on the part of Mahoning County." (Dkt. # 11, Robert Andrews Letter, Exhibit 6). Notwithstanding these assertions, Farah still fails to connect an identified custom or policy to Mahoning County, or show that a particular injury was incurred because of the execution of that custom or policy. Nor does he allege that Mahoning County failed to adequately train their deputies. Accordingly, Mahoning County is not liable pursuant to Section 1983 and Defendants are entitled to summary judgment with respect to the municipal liability claim.

**B.     The remaining state law claims**

The district court may decline to exercise jurisdiction over state law claims once its has dismissed those claims over which it has original jurisdiction. See 28 U.S.C. § 1367 (c) (3). As a general rule, if the claims over which the Court has original jurisdiction are dismissed before trial, the state claims should be dismissed as well. See United Mine Workers v. Gibbs,

383 U.S. 715 (1966).  Therefore, the Court declines to exercise supplemental jurisdiction over the Farah's state law claims and dismisses the claims without prejudice.

### C.    Motion to Strike

Finally, it is necessary for the Court to address Defendants' Motion to Strike  Farah's Exhibit 5, titled "Mahoning County Sheriff's Department Adverse Behavior Report," and Farah's Exhibit 6, a letter allegedly written by Mahoning County Assistant Prosecutor Robert J. Andrews to Judge Wyatt McKay of the Trumbull County Court of Common Pleas.  (Dkt. # 14).  Defendants argue that these two items "each fail[] to meet the standards set forth in Federal Rule of Civil Procedure 56 for evidence offered to oppose a summary judgment motion and that each is hearsay pursuant to Federal Rule of Evidence 802 and is thus inadmissable." (Dkt. # 14).  Farah asserts that "Exhibits 5 and 6 . . . clearly meet the standard of evidence required by Federal Rule of Civil Procedure 56(E)" and that "both items are admissible as an admission against a party under Federal Rule of Evidence 801(d)(2)."  (Dkt. # 16).

The Federal Rules of Civil Procedure allow for a motion for summary judgment to be supported or opposed "with or without supporting affidavits."   Fed. R. Civ. P. 56. Furthermore, Rule 56(e) of the Federal Rules of Civil Procedure provides:

> **(e)  Form of Affidavits; Further Testimony; Defense Required.**  Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response,

20

> by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  Furthermore, the Sixth Circuit has held that hearsay  evidence may not be considered on a motion for summary judgment.  See Wiley v. United States, 10 F.3d 222, 226 (6th Cir. 1994)(citations omitted).

It is well settled that unauthenticated documents cannot be considered on a motion for summary judgment.  In order to be considered by the court, "documents must be authenticated by and attached to an affidavit that meets the requirements of Fed. R. Civ. P. 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."  Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir.1987).  Federal Rule of Evidence 901(a) requires "authentication or identification as a condition precedent to admissibility."

In the instant matter, it is undisputed that neither Exhibit 5 or Exhibit 6 was authenticated as required by the Federal Rules of Evidence.  "A writing is not authenticated simply by attaching it to an affidavit, even if the writing appears on its face to have originated from some governmental agency."  Beyene v. Coleman Security Services, Inc., 854 F.2d 1179, 1182 (9th Cir.1988).  Farah has not laid such a foundation.  However, the Court took into consideration the challenged exhibits in evaluating Defendants' motion for summary judgment and nonetheless found in favor of the Defendants on the issue of qualified immunity.  Thus, even if Farah's Exhibits 5 and 6 had been properly authenticated, his use of these exhibits did not help him to overcome his burden in defeating Defendant's motion for summary judgment.  Therefore, Defendants' Motion to Strike is **DENIED as MOOT.**  (Dkt. # 14).

21

## V.      CONCLUSION

For the foregoing reasons, the Court hereby orders that Defendants' Motion for Summary Judgment (Dkt. # 4) is **GRANTED** in favor of Defendants Randall A. Wellington, Michael Budd, Frederick White, and Mahoning County on Farah's claims brought pursuant to 42 U.S.C. § 1983 arising from violations of his Eighth Amendment rights.  **JUDGMENT** is **GRANTED** in favor of Defendants Randall A. Wellington, Michael Budd, Frederick White, and Mahoning County on Farah's Eighth Amendment claims.  Farah's state law claim for personal injuries against Defendant Jacob DiCarlo (Count III of the Complaint) is **DISMISSED WITHOUT PREJUDICE**.  Finally, Defendants Motion to Strike (Dkt. # 14) is **DENIED as MOOT**.

**IT IS SO ORDERED.**

**/s/ Peter C. Economus – March 7, 2007**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**